**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3783-17T2

L.P.,

      Plaintiff-Appellant,

v.

M.P.,

      Defendant-Respondent.

_____

Argued February 28, 2019 – Decided April 3, 2019

Before Judges Simonelli and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FM-08-0445-07.

Christine C. Cockerill argued the cause for appellant (Puff & Cockerill, LLC, attorneys; Christine C. Cockerill, of counsel and on the brief; Paul R. Melletz, on the brief).

David R. Nussey argued the cause for respondent (Klineburger & Nussey, attorneys; David R. Nussey, of counsel; M.P., on the pro se brief).

PER CURIAM

Plaintiff L.P.,[1] mother, appeals from Family Part orders sanctioning her for not complying with an order compelling her to have the parties' son, Matthew, meet his father, M.P., for weekly lunches, and for not having the child treated by an approved provider. L.P. also challenges the trial court's award of child support which the court entered without considering financial information or the child support guidelines and without conducting a hearing. Because the orders do not sufficiently detail the Family Part's findings and legal support thereof, we reverse and remand for further proceedings.

I.

We set forth the procedural history and facts relevant to this appeal. The parties were divorced and entered into a Marital Settlement Agreement (MSA) on May 5, 2008, which was incorporated into their final judgment of divorce.[2] Two children were born of the marriage, Grace, now emancipated, and Matthew, born in December 1997. Matthew is the subject of this appeal. The MSA provided for a "true shared physical custody agreement on behalf of both children." A custody and parenting time order entered in October 2007

---

[1] We use initials or pseudonyms to protect the privacy of the parties. R. 1:38-3(d)(3) and (13).

[2] Neither party provided the MSA nor the judgment of divorce in their appendices.

A-3783-17T2

provided: "Neither party shall be deemed to have any superior right on any issue over the other, and each shall stand completely equal as to the children."

Matthew is a special needs child diagnosed with autism, bipolar disorder, Oppositional Defiant Disorder (ODD),[3] conduct disorder, and depression. Twenty-two orders have been filed relative to Matthew's custody, parenting time and needs since the divorce.[4] Between February 2013 and sometime in 2015, Matthew chose to live with his father following a violent confrontation with his mother. Matthew refused to visit his mother in 2014 after an incident where she handcuffed him and had him removed from her home by the police.

In response to that incident, L.P. retained Dr. Annie Steinberg, a pediatric developmental expert at Children's Hospital of Philadelphia (CHOP). The expert issued a report on December 18, 2014, recommending that M.P. continue

---

[3]   Symptoms of ODD can seriously interfere with a person's day-to-day functioning. Symptoms may include: frequent temper tantrums; excessive arguing with adults; often questioning rules; active defiance and refusal to comply with adult requests and rules; deliberate attempts to annoy or upset people; blaming others for his or her mistakes or behavior; often being touchy or easily annoyed by others; frequent anger and resentment; mean and hateful talking when upset; spiteful attitude and revenge seeking. Oppositional Defiant Disorder, Am. Acad. of Child & Adolescent Psychiatry, (last visited Mar. 12, 2019), https://www.aacap.org/aacap/families_and_youth/facts_for_families/fff-guide/Children-With-Oppositional-Defiant-Disorder-072.aspx.

[4]  Our record only includes orders from September 24, 2015 to the present.

primary care of Matthew; continue educational and treatment plans for Matthew; and "cautiously and gradually reintroduce the child to his mother so as to restore a parent-child relationship." Matthew was undergoing weekly family and individual counseling with a behavioral therapist through Perform Care. Dr. Steinberg opined in her fifty-seven page report that "Matthew achieved all of the objectives that were established with no recurrence of physical aggression and essentially compliant behavior with all the rules of the house." An Individualized Education Plan (IEP) was implemented at Bankbridge School for Matthew.

Dr. Steinberg confirmed Matthew's diagnoses, adding complex partial epilepsy and a developmental disability with an IQ of 52. After conducting clinical interviews, the expert concluded that Matthew wanted to "stay with someone that . . . [he] feels comfortable with. And that person is [his] dad." Concern was expressed by Dr. Steinberg about L.P.'s "negativity towards Matthew's then current treatment providers, her lack of understanding of Matthew's anxieties and fears and her lack of ability to de-escalate Matthew when he is agitated." L.P. would "likely . . . attempt to alienate her son from his father[,]" according to Dr. Steinberg. Dr. Steinberg recommended continuing Matthew in the primary care of his father, who she felt should be responsible for

Matthew's educational and treatment plans. Since Matthew had been in his father's sole custody since 2013, Dr. Steinberg recommended a gradual reintroduction to his mother to "restore a parent-child relationship." Her report and recommendations were adopted by the court.

For a period of time, Matthew refused to visit with his mother, but following reunification therapy initiated by M.P., Matthew returned to live at her home in July 2015 because his father was an alcoholic and verbally abused him. Matthew refused to visit his father, ceased treatment, and declined to enroll in any post-high school educational programs. Matthew's therapy records state he told his father that L.P. claimed she was raped by him.

Dr. Prabhaker S. Patel, who was retained by L.P., conducted a psychiatric evaluation of Matthew on August 24, 2015, and reported that Matthew claimed his father attempted to strangle him more than once, and he felt "calm" at his mother's house.

In her September 24, 2015 order, the prior family judge recounted:

> The [c]ourt took brief testimony on Thursday, August 27, 2015, regarding the issues outlined above related to [the] occurrence between August 7 and the hearing date.
>
> A brief summary of the court's findings follows: The [c]ourt heard [M.P.'s] update as to the events of [a] previously planned Wildwood family vacation for

A-3783-17T2

himself with the parties' two children. During the first day of that holiday, after an uneventful but happy day on the beach, Matthew became increasingly agitated with his father, accused him of being a bad person, and repeatedly indicated he hated him and that he wanted to return to his mother. His father returned him to his mother's home the first evening of the trip. The court makes a preliminary finding, based on [M.P.'s] testimony that the child's agitation and accusations were caused by persistent negative communication initiated by [L.P.] with Matthew, regarding [father]. These communications most likely continue, are frequent and did and are causing emotional harm to the minor child. Nevertheless, the clinical risk to the child, should the court now order that the child be forcibly removed from [L.P.'s] custody without proper therapeutic support for the child and [M.P.], is both great and unpredictable.

The court further found and placed on the record on August 27, 2015, that the developments regarding [L.P.'s] visits beginning in early July were contrary to the comprehensive, interrelated and well considered and evidentially supported recommendations of Dr. Annie Steinberg's evaluation of December [18], 2014. Dr. Steinberg was [L.P.'s] retained expert. Dr. Steinberg's plan was adopted in full by the [c]ourt's [order] of [January 15, 2015] [and] [March 16, 2015]. The March [o]rder also vacated the prior order ([December 13, 2013]) scheduling plenary hearing of [L.P.'s] cross-motion to restore her parenting time, originally filed by her on September 17, 2013.

Without considering L.P.'s testimony or any other proofs, the prior judge

also ordered as follows:

6

[L.P.] is authorized, pending further court order to temporarily provide day-to[-]day care for Matthew and to act as his legal custodial parent.

[L.P.] is also authorized to change Matthew's designated school district for the purpose of ensuring the child is eligible for bus transportation to Bankbridge School from her home.

[L.P.] is not authorized to replace any of the authorized members of Matthew's current health care treatment plan, to include Dr. Borgmann-Winter and counselor Charles Marder, absent written agreement of the parties or court order.

[L.P.] will continue to schedule Matthew for and bring him to all scheduled appointments with the professionals who constitute the child's health care team as listed above. It is the court's intention that [M.P.] will participate in sessions and consultations with Matthew, so as to continue to work on restoration of his relationship with Matthew. [L.P.] may also participate in sessions with the minor child at the therapist or psychologist's recommendation. Should additional counseling sessions be needed in order to impl[e]ment these provisions, both parties will cooperate to ensure that the child is present for all necessary sessions.

Mr. Marder, Dr. Steinberg and Dr. Borgman[n]-Winter are to be provided with a copy of Dr. Patel's report (date[d] [August 24, 2015]) as well as this and [the] [August 7, 2015] court order. Dr. Patel's evaluation was obtained by [L.P.], after she failed to return Matthew to his father's home, in violation of the prior court [o]rders and Dr. Steinberg's plan. She did not provide [Dr. Patel] with any of the prior evaluations or

this [c]ourt's [o]rders. Other than Matthew, she was the sole reporter.

Under no circumstances is either party to show any of the court orders to the child Matthew.

Matthew's legal and physical custody otherwise remains with [M.P.]. [L.P.] must contact [M.P.] immediately should Matthew require any medical appointment or emergency treatment to include psychiatric or crisis care.

Jaclyn E. Kusmaul, Esq. was appointed as guardian ad litem (GAL) pursuant to Rule 5:8B(a)[5] and charged with conducting a best interests report, including implementation of Dr. Steinberg's recommendations and to otherwise "restore the relationship between Matthew and his father."

---

[5] In pertinent part, Rule 5:8B(a) provides:

> In all cases in which custody or parenting time/visitation is an issue, a guardian ad litem may be appointed by court order to represent the best interests of the child or children if the circumstances warrant such an appointment. The services rendered by a guardian ad litem shall be to the court on behalf of the child. A guardian ad litem may be appointed by the court on its own motion or on application of either or both of the parents. The guardian ad litem shall file a written report with the court setting forth findings and recommendations and the basis thereof, and shall be available to testify and shall be subject to cross-examination thereon.

Because M.P. was no longer the parent of primary residence, the prior judge adjusted the $400 weekly child support obligation L.P. was paying to him to $200 per week, payable through probation, and the other $200 was applied towards GAL fees. This modification was made without the benefit of case information statements, a hearing, or any explanation as to why the judge did not apply the Child Support Guidelines as set forth in Appendix IX-A to Rule 5:6A, which was warranted on the basis that L.P.'s income exceeded $300,000 at that time.[6] The order also directed M.P.

> to maintain a real-time accounting of how he is utilizing the support he receives on Matthew's behalf through probation (i.e. $200 per week) as he is no longer caring for the child directly in his home. It is the [c]ourt's intent that he steward support payments so as to have adequate resources to address Matthew's needs once the child resumes parenting time with him, towards future individual and family counseling and similar expenses.

A month before Matthew's eighteenth birthday, the prior judge adopted the GAL's recommendation[7] that Matthew have weekly, two-hour lunches with his father with the goal to "increase, in frequency and length, as quickly as possible . . . ." L.P. was warned that she was "on notice that her good faith

---

[6] All of this information was confirmed by counsel at oral argument.

[7] The GAL's report is not part of our record and the recommendations were not included in any order.

compliance with the [c]ourt's directives regarding the child's relationship with his father is fundamental to the child's best interest." L.P. improperly provided Matthew "unmonitored access to her email and text communications in which she negatively described the court's orders" in respect of the revised child support obligation. The judge held:

> This communication was in violation of the Children's Bill of Rights. It was also fundamentally misleading to the then minor child as the evidence makes clear that Matthew believes that his father is illicitly taking $400 each week as child support and tells professionals that his father is stealing this money, only cares about the child's custody issues because of this money. Matthew's belief about child support ha[s] caused grave harm to the father[-]child relationship. That relationship had, until recent events, been a good one; which helped Matthew to thrive at home and in school . . . . [L.P.] made no effort to password protect or otherwise limit Matthew's use of the phone and access to this highly sensitive and damaging information. The court found her actions at best, reckless and at worse, intentional.

M.P. was directed to provide the names of three psychiatrists and therapists who specialized in Matthew's form of autism and who were in-network to L.P. In December 2015, Matthew turned eighteen. A debate ensued when the parties could not agree on healthcare providers for Matthew, and L.P. selected Dr. Perry Zand, a psychiatrist, ostensibly without confirming same with M.P. Dr. Zand submitted two letters to the prior judge, the first dated June 20,

10

2016, opining that Matthew should have a voice in his education, and the second dated November 6, 2016, stating that it would be "harmful" to Matthew's health to compel him to visit his father.

Two in camera interviews of Matthew were conducted by the prior judge, one while he was residing with his father, and the other in March 2016 when he was residing with his mother. During the second interview, Matthew stated, "I'm addicted now to being with my mother." He refused to believe that his mother wanted him to regain a relationship with his father even though the judge "show[ed] him" instances confirming this. This led the prior judge "to question, despite what [the] mother is saying in various documents . . . whether she [was] doing anything truly to urge this child to see his father or go to the doctors who specialize in his type of care." A plenary hearing was deemed unwarranted because the prior judge did "not believe that this child is being encouraged by his mother to see his father or to go to the team of doctors . . . that specialize in his care because his mother [did not] want those things to happen."[8]

In an order dated March 18, 2016, the prior judge determined that sanctions would be imposed against L.P. at a rate of $50 per violation if Matthew

---

[8] L.P. filed a motion for leave to appeal, for stay pending appeal, and for expedited relief that we denied on May 31, 2016. Her motion for leave to appeal and for a stay filed with our Supreme Court was denied on September 12, 2016.

did not attend future weekly lunches with his father. The order also terminated L.P.'s child support obligation because she became the parent of primary residence, and M.P. was directed to deposit any overpaid child support he received in a trust for Matthew's benefit.

Dr. Lawrence P. Clinton, a psychiatrist, was contacted by L.P.'s attorney in April 2016, to conduct a psychiatric evaluation of Matthew. Dr. Clinton reported that Matthew is "handicapped due to [a] brain injury that he sustained as an infant . . . ." Matthew told Dr. Clinton that he fought with his father during a 2015 summer vacation in Wildwood because Matthew refused to eat and do the dishes. An altercation ensued, and Matthew claimed "his father took a knife and his fist and threatened him . . . ." Matthew also reported that while he was singing in the bathtub, his father told him to "shut the hell up." Dr. Clinton concluded that Matthew "has sufficient anxiety concerning his father" and his "father's drinking[,]" and Matthew cannot "manage his own funds at this time." L.P. certified that M.P. was abusive towards her during the marriage, resulting in the issuance of temporary restraining orders, and that M.P. suffers from bipolar disorder, depression, and extreme anxiety.

A limited guardianship petition was filed and on June 29, 2016, a probate judge declared Matthew incapacitated and unable to manage his financial

12

affairs. The probate judge's order provided that Matthew had the following rights:

> a. He shall retain the right to establish friendships and have visitation with his friends;
>
> b. He shall retain the right to determine his level of participation in religious activities;
>
> c. He shall retain the right to correspond with others and to use mail or e-mail;
>
> d. He shall retain the right to plan/select a schedule of leisure activities;
>
> e. He shall retain the right to pursue "YouTube" activities and goals;
>
> f. He shall retain the right to legal counsel; and
>
> g. Provided he is otherwise legally qualified, he shall retain the right to vote.

L.P. was appointed as limited guardian of the person of Matthew, providing her, by consent of M.P., with decision-making authority for the following matters:

> a. The authority to make medical decisions, including decisions regarding his care and treatment;
>
> b. The authority to make decisions regarding his healthcare including the need for medical/surgical procedures and diagnostic testing;

13

c. The authority to <u>select his healthcare providers</u> and dental providers;

d. The authority to <u>oversee and manage his use of medication, including prescription medication</u>;

e. The authority to <u>schedule appointments</u> with healthcare providers and dental providers . . . ;

f. The authority to sign/execute any forms necessary to provide informed consent for his medical care and treatment; and

g. Should the circumstances arise, authority to continue to withdraw life-sustaining medical care for him.

[(Emphasis added).]

This authority was to be exercised in consultation with Matthew. M.P. was appointed, <u>by consent of L.P.</u>, as limited guardian of Matthew's property and estate, thereby providing M.P. with the authority to manage Matthew's financial affairs and to expend his assets for Matthew's support, maintenance, education, and benefit, within reasonable discretion. The parties were jointly named Health Insurance Portability and Accountability Act (HIPAA) representatives for Matthew.

The probate judge ordered L.P. to "file with the [s]urrogate a report of the well-being of Matthew . . . within thirty days of the date of this [j]udgment and then at intervals of ninety days thereafter." As to M.P., the probate judge

14

ordered him to provide Matthew $50 weekly for his discretionary spending, to be withdrawn from the Eleanor Murphy Trust, which was created by Matthew's deceased maternal grandmother as a "special needs" trust and not for his "basic support." The probate order required the parties to work together with the Kingsway Child Study Team in order to formulate a suitable post-high school educational plan for Matthew. Any dispute relative to Matthew had to be submitted to Colleen T. Collins, Esq. for mediation prior to any applications being filed with the probate court. A November 16, 2016 probate order clarified that M.P. retained the right to, "investigate, advocate, [and] implement an education program for Matthew." Notably, the June 29 and November 16 probate orders were never appealed from and therefore, are final orders.

The matter was heard again in the Family Part[9] and on December 20, 2016, the prior judge noted "extreme concern for Matthew, including his well-being and mental health." M.P. certified that L.P. was not taking Matthew to counseling or therapy, other than a monthly visit to Dr. Zand for medication monitoring, and that Matthew was home all day, unemployed, and making YouTube videos. L.P. asserted that she overpaid $2,554.19 in child support to

---

[9] The record is devoid of any explanation by the Family Part judge or counsel as to why the parties' disputes regarding Matthew were not mediated first with Collins, as ordered by the probate judge.

M.P., and the prior family judge ordered this sum to be withdrawn from Matthew's trust fund and refunded to L.P., pending a review of child support payment records. M.P. certified that Matthew's trust fund had a balance of $4,864.96, inclusive of the alleged overpayments. In denying L.P.'s request to transfer the $4,864.96 to her, the prior family judge stated that L.P. was "more than capable of meeting her monthly budget, and [did] not need this money for Matthew's care each month[,]" noting that the money should be saved for future use. Again, no hearing was conducted, notwithstanding Matthew reaching the age of majority and insufficient financial information being provided to the court.

Saliently, the prior family judge enforced the weekly $50 sanction against L.P. because of her "blatant and will[ful] violation of the previous [c]ourt [o]rder, by not having Matthew meet [his father] for weekly lunches, and not having Matthew be treated by an approved provider . . . ." The sanctions totaled $1350 and covered the period of March 2016 through November 2016. The $1350 sanction was to be deducted by M.P. from potentially overpaid child support. M.P. argued that Matthew could have continued services at Bankbridge School until age twenty-one, but L.P. refused to enroll him. Because the June

29, 2016 probate order gave L.P. authority over Matthew's educational objectives, M.P. withdrew his request.

After the prior family judge retired, a subsequent Family Part judge issued an order on January 22, 2018 denying L.P.'s request to compel M.P. to adhere to her authority to "pick and choose all of Matthew's medical doctors, dentists, and therapists, and schedules when she deems appropriate . . . ." L.P.'s motion was denied because the judge determined that the limited guardianship order

> was not intended to eliminate the . . . other parent's rights and responsibilities to have a relationship with the child and for that parent to advocate for the completion of the educational services available to him until he is [twenty-three] years of age. These are essential rights of this child[,] which were developed and pursued by his father in family court.

This order also required M.P. to begin paying $75 per week in child support to L.P., which was to be deposited into either a special needs trust, or an Achieving a Better Life Experience (ABLE) account,[10] in order to not jeopardize Matthew's right to receive government benefits. This fund was to

---

[10] An ABLE account is a "tax-advantaged savings account for individuals with disabilities and their families . . . . The beneficiary of the account is the account owner, and income earned by the accounts will not be taxed. Contributions to the account . . . must be made using post-taxed dollars . . . ." [What are ABLE Accounts?], ABLE: Nat'l Res. Ctr. (last visited Mar. 12, 2019), www.ablenrc.org/about/what-are-able-accounts.

serve as a source for Matthew's return to school and for counseling to restore his trust in others, including this father.  The judge also ordered any future sanctions assessed against L.P. to be paid into this account.  L.P. was also held in contempt of court for violating the December 2016 order "for various infractions[,] including but not limited to refusing to provide the names of [three] counselors to [M.P.] in order for Matthew to initiate weekly counseling . . . ."  L.P. filed a motion for reconsideration in April 2018, which was denied by a third Family Part judge, and not the judge who entered the January 22, 2018 order.

On appeal, L.P. argues: the order sanctioning her retroactively and prospectively should be rescinded; the $1350 in sanctions should be vacated and the funds returned to her; the orders restricting her authority to choose healthcare providers for Matthew should be rescinded; the child support amount should be reconsidered; overpayments in child support should be refunded to her; the order directing M.P. to set up a special needs trust and ABLE account should be vacated; and the order prohibiting her from filing further applications unless she can demonstrate substantial compliance should be vacated.  In response, M.P. argues: the appeal should be denied; sanctions should continue to be enforced against L.P.; L.P. is incapable of managing Matthew's finances; and parental alienation is still being effectuated by L.P.

II.

A trial court's fact-finding should be generally undisturbed "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). The appellate court gives particular deference to a trial judge's fact finding in a family matter because of the trial court's expertise and its "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

A trial judge's fact-finding should only be reversed if it is "so wholly unsupportable as to result in the denial of justice." In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). This court should not reverse the family court's decision "when there is substantial credible evidence in the record to support the court's findings." E.P., 196 N.J. at 104.

L.P. argues that Matthew is over eighteen years old and cannot be forced to visit his father or undergo treatment against his wishes. Despite Matthew's incapacitation, the limited guardianship order requires her to confer with him as

to his treatment and, therefore, the $50 per week sanction order was an abuse of discretion. A plenary hearing was required to be conducted here pursuant to Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007), prior to the entry of the limited guardianship order of June 29, 2016, because the trial judge must articulate reasons for custody and parenting time determinations and refer specifically to the pertinent statutory criteria. See N.J.S.A. 9:2-4(c); Kinsella v. Kinsella, 150 N.J. 276, 317 (1997). These factors are:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.
>
> [N.J.S.A. 9:2-4(c) (emphasis added).]

These considerations apply equally to parenting time disputes. "[V]isitation rights are almost 'invariably' granted to the non-custodial parent." V.C. v. M.J.B., 163 N.J. 200, 228 (quoting Beck v. Beck, 86 N.J. 480, 495 (1981)).

"A plenary hearing is required when the submissions show there is a genuine and substantial factual dispute regarding the welfare of the child[]. . . ." Hand, 391 N.J. Super. at 105. We have stated that a decision made "without an evidential basis, without examination and cross-examination of lay and expert witnesses, and without a statement of reasons is untenable in the extreme." Fusco v. Fusco, 186 N.J. Super. 321, 327 (App. Div. 1982). The age of a child has a great deal to do with the weight attached to his or her preference.

In making a custody or visitation determination, a judge should "conduct a private examination of [the] child in order to discover [his] wishes as to custody . . . [and] to ascertain the predilection of the child . . . ." Lavene v. Lavene, 148 N.J. Super. 267, 273 (App. Div. 1977) (quoting Callen v. Gill, 7 N.J. 312, 319 (1951)).

The prior family judge noted that Matthew "had such good manners the last time" the judge interviewed him, but that he "spoke rudely about almost every doctor he use[d] to have a good relationship with and called doctors rude." The prior judge reminded Matthew that at one point he did not want to see his

mother and he used to have a good relationship with his father. Matthew stated that his father had become "ruthless over the years[,]" and he did not disclose this behavior at the prior interview because he wanted to keep it to himself. The judge noted that Matthew lost eye contact when explaining his reason. She determined that Matthew is not a person "that can reliably report about himself" because his attitude was essentially "I told you the truth then. I'm telling you the truth now. I don't really care that none of it matches up, [j]udge, just leave me alone."

During the March 18, 2016 motion hearing, the prior judge determined she did not "need a [p]lenary hearing at [that] point to find that [she did] not believe that this child [was] being encouraged by his mother to see his father or to go to the team of doctors that . . . specialize in his care because his mother [did not] want those things to happen." In the case before us, the prior judge improvidently served as fact-finder and essentially relied solely on her "unreliable" interviews with Matthew for her decision.

In Wilke v. Culp, 196 N.J. Super. 487, 504 (App. Div. 1984), we reversed and remanded a trial court's order denying M.P.'s request for a plenary hearing to determine whether visitation should have been reinstated, to consider the best interests of the child, and to determine whether any conditions should be

imposed on visitation. There, "[t]he trial judge . . . accepted without question that there [was] no room in the [child's] life for the natural father." Id. at 502. The trial judge conducted an in camera interview with the fifteen-year-old child. Id. at 495. The child earnestly requested not to have visitation with his father because he had not seen him for approximately ten years. Id. at 497.

The parties had a lengthy custody battle, which included allegations that the mother purportedly positioned the son against his father. Id. at 491-96. Oral argument was held based on the papers filed in connection with the father's motions, but no testimony was elicited from either party, and no psychological examination was conducted. Id. at 495. Instead, the judge relied only on the child's interview and the conflicting affidavits of the parties. Id. at 499. We remanded the matter because of the trial judge's failure to address certain issues; ordered a guardian ad litem to be appointed; and ordered a plenary hearing to explore the issue of whether the father's lack of past visitation and the child's "attitude are attributable to the child's mother . . . ." Id. at 503.

In a similar vein here, the prior family judge wrongly made a determination regarding visitation based on the parties' conflicting certifications and Matthew's interviews, finding:

> I don't need a [p]lenary hearing to find that [L.P.'s] actions have caused this child to be alienated from his

23

father and I needed the help of the guardian ad litem to get some assistance and recommendations on how to go forward to try to repair that . . . . [and] [L.P.] holds the key to that progress in fact, just as [M.P.] once did. He once did and he cooperated. I don't know that I would have ever been able to restore [Matthew's] relationship with his mother if his father had not cooperated. The child is trusting of his parents, maybe it's only one at a time, but he will do what his mother asks him, I really can't doubt that. I don't think I need a [p]lenary hearing to determine that.

We disagree. Matthew was not under the care of a psychiatrist in March 2016, and the parties were still debating insurance and out-of-network providers at that time. Alienation could not be found without factual and expert testimony. Having no professional on board who could weigh in on the issue of Matthew's best interests vis-à-vis his father at that time, and failing to conduct a plenary hearing, constituted an abuse of discretion by the prior family judge.

III.

A. <u>Sanctions</u>

A trial court's imposition of sanctions is reviewed under the abuse of discretion standard. <u>See</u> <u>Innes v. Carrascosa</u>, 391 N.J. Super. 453, 498 (App. Div. 2007). Economic sanctions must "rationally relate[] to the desideratum of imposing a 'sting' on the offending party within its reasonable economic means." Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 4.4.3 on <u>R.</u> 1:10-3 (2019).

24 <span style="float:right">A-3783-17T2</span>

Rule 1:10-3 provides that "[n]otwithstanding that an act or omission may also constitute a contempt of court, a litigant in any action may seek relief by application in the action." Moreover, "[o]n finding that a party has violated an order respecting custody or parenting time, the court may order, in addition to remedies provided by R[ule] 1:10:3 . . . economic sanctions . . . and . . . any other appropriate equitable remedy." R. 5:3-7(a)(2), (10).

In deciding the motion for reconsideration, the third family judge upheld sanctions against L.P.

> because of her failure to properly allow for reunification and the failure of her to do what is in [Matthew's] best interest, which is the plan put forth by the folks at [CHOP] together with the execution of his IEP. Because, otherwise, he's simply going to be a ward of the [S]tate for the rest of his life.

The reconsideration judge also found "that allowing an autistic [nineteen] year-old with learning disabilities to sit in a room and play video games and make YouTube videos with the hope of becoming a YouTube sensation so he can get his ad revenue up is not realistic, it's tantamount to child abuse."

L.P. correctly argues that the limited guardianship order gave her the authority to make educational and medical decisions in consultation with Matthew. L.P. certified that during his last session at CHOP, Matthew "stormed

out" and refused to return, stating he did not need their services anymore. L.P. also stated that Mr. Marder, a counselor, indicated that Matthew no longer needed his services. Because M.P. failed to demonstrate that L.P. was alienating Matthew from him, or any of her acts or omissions were intentional, the sanctions were punitive and unwarranted.

No explanation was provided by the prior family judge as to how she arrived at $50 per week as a sanction or why M.P. was permitted to offset his child support obligation against the sanction imposed, and no consideration was given to L.P.'s ability to pay the sanctions. A trial court is required "by an opinion or memorandum decision, either written or oral, [to] find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right . . . ." R. 1:7-4(a). We conclude the prior judge mistakenly exercised her discretion in awarding sanctions and by enforcing the sanctions and denying reconsideration. Therefore, we reverse and vacate the orders as they pertain to retroactive and prospective sanctions and we vacate the $1350 assessment against L.P.

B. Healthcare Decisions for Matthew

L.P. next argues that the January 22, 2018 order should be vacated insofar as the subsequent family judge abused his discretion by limiting her authority in

respect of Matthew's medical, healthcare, and dental decisions. The judge stated "[t]here is no basis in fact or law" to give "a narrow and strict interpretation to the [g]uardianship [order]" to "void the series of motion rulings regarding this unemancipated and incapacitated adult child of both parties to require appropriate psychological and developmental care so as to secure a relationship with the child's father and to complete an adequate education." We disagree.

A probate court may appoint a limited guardian of an individual if it finds that the "individual is incapacitated and lacks the capacity to do some, but not all, of the tasks necessary to care for himself . . . ." N.J.S.A. 3B:12-24.1(b). Rule 4:83-4(b) provides that "an action for the appointment of a guardian for an alleged mentally incapacitated person" shall be made in the Probate Part of the county in which the person is domiciled. Further, the probate court may appoint a guardian ad litem for an incapacitated person, to assist the court in determining the best interests of that person. R. 4:86-4(d).

The December 2, 2016 Family Part order entered by the prior judge aptly found that Matthew's health, education, and financial issues would be determined by the probate court, and not the Family Part, going forward. Only issues pertaining to child support and parenting time would be adjudicated in the Family Part thereafter. The record reflects that a case management order

was entered by the probate judge addressing Matthew's educational issues. We therefore conclude that the December 2, 2016 order properly severed the issues to be handled by the Family and Probate Parts.

Now that Matthew is over the age of twenty-one, the issue of parenting time is beyond the jurisdiction of the Family Part and should be mediated first with Collins going forward as part of the limited guardianship matter. The only issue remaining within the purview of the Family Part's jurisdiction is child support until Matthew attains the age of twenty-three.[11] An application may also be brought before the Probate Part to consider "a child support obligation for an . . . incapacitated person who has reached the age of [twenty-three] to another form of financial maintenance . . . ." R. 4:86-7A.

## C. Child Support

In her final argument, L.P. argues that the prior judge abused her discretion by arbitrarily ordering child support to be paid by M.P. at the rate of $75 weekly without considering probative, competent evidence of L.P.'s

---

[11] N.J.S.A. 2A:17-56.67, enacted on January 19, 2016, applies to child support orders entered prior or subsequent to February 1, 2017. Age nineteen is the presumptive age for termination of child support, and support may continue until the child's twenty-third birthday.

subsequent disability and unemployment, or M.P,'s base salary of $145,000 plus bonuses.  We agree.

There is ample precedent for declaring children over the age of eighteen to be unemancipated when they are still completing their education, are economically dependent on their parents, and remain within the parental "sphere of influence and responsibility . . . ." Filippone v. Lee, 304 N.J. Super. 301, 308 (App. Div. 1997) (quoting Bishop v. Bishop, 287 N.J. Super. 593, 598 (Ch. Div. 1995)); see also N.J.S.A. 2A:34-23(a).  In the circumstances of this case, Matthew is financially dependent on his mother and fits the definition of an unemancipated child.

When reviewing decisions to grant applications to modify child support, we examine whether, given the facts, the judge abused his or her discretion. Larbig v. Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006).  "The trial court has substantial discretion in making a child support award.  If consistent with the law, such an award 'will not be disturbed unless it is "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice."'" Foust v. Glaser, 340 N.J. Super. 312, 315-16 (App. Div. 2001) (citation omitted) (quoting Raynor v. Raynor, 319 N.J. Super. 591, 605 (App. Div. 1999)).  We may thus reverse a trial court's decision when it "is 'made

without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis.'" <u>Flagg v. Essex Cty. Prosecutor</u>, 171 N.J. 561, 571 (2002) (quoting <u>Achacoso-Sanchez v. Immigration & Naturalization Serv.</u>, 779 F.2d 1260, 1265 (7th Cir. 1985)).  Moreover, we are not bound by "[a] trial court's interpretation of the law" and do not defer to legal consequences drawn from established facts.  <u>Manalapan Realty, LP v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

By statute, parents are required to provide for the financial support of their unemancipated children.  N.J.S.A. 2A:34-23(a).  The State has established presumptive guidelines, and a corresponding worksheet, to calculate child support (the Guidelines).  <u>See</u> Child Support Guidelines, Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-A and IX-B to <u>R.</u> 5:6A, www.gannlaw.com (2019).  The court rules prescribe that the Guidelines "shall be applied when an application to establish or modify child support is considered by the court." <u>R.</u> 5:6A.  "A court may deviate from the [G]uidelines only when good cause demonstrates that [their] application . . . would be inappropriate." <u>Lozner v. Lozner</u>, 388 N.J. Super. 471, 480 (App. Div. 2006).

In establishing "the amount to be paid by a parent for support of the child[,]" the court must consider, among other factors:  the "[s]tandard of living

30

and economic circumstances of each parent;" "[a]ll sources of income and assets of each parent;" the "[e]arning ability of each parent"; and the "[r]esponsibility of the parents for the court-ordered support of others . . . ."  N.J.S.A. 2A:34-23(a).

In reviewing the matter at hand, the prior family judge did not address L.P.'s argument that she was "laid off" from her previous employment, where her earnings averaged $300,000 annually; she is now permanently disabled; and she receives $2936 monthly in Social Security Disability Insurance (SSDI) benefits.  L.P. claims that Matthew receives $532.98 in SSDI benefits and M.P. states the amount is $1,468.12.[12]  Initially, the prior family judge refrained from ordering child support to be paid by M.P. to L.P. to avoid potentially jeopardizing Matthew's ability to collect governmental benefits, such as Social Security Insurance (SSI) or SSDI.  L.P. received a one-time SSI payment in the amount of $5,166.91 in April 2018 on behalf of Matthew, representing payments from July 2016 through March 2017 and September 2017.  The record does not provide how, if at all, this sum was applied to either parent's child support obligation.

---

[12]  SSDI information was not provided in the record.  In any event, the record does not reflect that Matthew's SSDI benefits were taken into consideration in determining child support.

A-3783-17T2

The parties did not submit updated case information statements or required attachments, such as tax returns, W-2 forms, 1099s, or bonus information for consideration by the court. According to the Guidelines, the court would need to review all of this information to determine the appropriate amount of income for inclusion in the recalculation of child support. Instead, the prior family judge ordered M.P. to arbitrarily pay $75 weekly into an ABLE account for Matthew's education and therapy needs. This is contrary to the spirit and intent of the Guidelines, which were designed to provide an appropriate level of support for a child's ongoing shelter, transportation, and personal expenses. The prior family judge rejected L.P.'s request for weekly child support of $500. Again, Rule 1:7-4 was not complied with. "Naked conclusions" are not enough; there must be some stated correlation between the facts and the applicable law. Curtis v. Finneran, 83 N.J. 563, 570 (1980). Ultimately, "[m]eaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion." Strahan v. Strahan, 402 N.J. Super. 298, 310 (App. Div. 2008) (quoting Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990)).

We reverse the order fixing child support and remand for additional proceedings to complete the required calculation under N.J.S.A. 2A:34-23(a).

In doing so, the judge must make a determination as to both parties' earned and unearned incomes, and factor in any SSDI or other governmental benefits Matthew may be currently receiving. We defer to the trial judge to determine whether the submission of additional financial documentation and a plenary hearing is necessary to address these or other materially disputed issues, and to provide an explanation if the Guidelines are not followed.

In sum, we conclude as follows:

(1)   The March 18, 2016 order imposing sanctions against L.P. is reversed and vacated.

(2)   The $1350 sanction order entered against L.P. is reversed and vacated.

(3)   The June 29, 2016 limited guardianship order entered in the Probate Part shall remain in full force and effect.   The Probate Part shall have exclusive jurisdiction over all issues concerning Matthew, with the exception of child support, which shall be subject to the jurisdiction of the Family Part until Matthew reaches the age of twenty-three.   At that time, the

33

Probate Part shall assume jurisdiction over child support.

(4) The Family Part orders entered relative to child support and establishing a special needs trust or ABLE account are reversed and vacated. The issue of calculation of child support to be payable to L.P. by M.P. shall be determined in a proceeding consistent with our opinion. On remand, the parties may address the need for a trust or ABLE account for Matthew.

Reversed, vacated, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3783-17T2